## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Case No.

KERSTIN ANDERSON

      Plaintiff,

v.

THE TOWN OF DILLON

      Defendant.

---

## COMPLAINT AND JURY DEMAND

---

      Kerstin Anderson ("Plaintiff" or "Ms. Anderson") by and through her attorneys, H&K Law, LLC, submits the following Complaint and Jury Demand against Defendant The Town of Dillon:

### PARTIES

      1.     Plaintiff is an individual who resides in Colorado with a mailing address of PO Box 5703, Dillon, CO  80435.

      2.     The Town of Dillon ("Defendant") is a home rule municipality in the state of Colorado with a principal location of Dillon Town Hall, 275 Lake Dillon Drive, Dillon, Colorado, 80435 according to the Town of Dillon's website.

### JURISDICTION AND VENUE

      3.     This Court has jurisdiction over the parties to this lawsuit because the underlying events occurred in the State of Colorado and the Defendant is found in Colorado.

4.      This Court has subject matter jurisdiction over this lawsuit under 28 U.S.C. § 1331 because it arises under a federal statute, Title VII of the Civil Rights Act of 1964, particularly 42. U.S.C. §§ 2000e *et seq*. ("Title VII").

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because the employment practices and other actions alleged to be unlawful were committed in the District of Colorado.

6.      Defendant has received federal funds and/or grants, engages in interstate commerce, and employs far more than 15 employees in Colorado.

7.      Defendant is an employer within the meaning of Title VII.

8.      Plaintiff worked for Defendant in Colorado from April 21, 2015 to February 9, 2022.

9.      Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") (cross-filed with the Colorado Civil Rights Division) and the EEOC found cause to believe that Defendant violated Title VII.

10.     The EEOC attempted, but was unable, to successfully conciliate this matter, referring it to the Department of Justice ("DOJ").

11.     Plaintiff has filed this lawsuit within 90 days of receipt of the right to sue letters from the DOJ.

## GENERAL ALLEGATIONS

12.     Despite Plaintiff's exemplary performance and dedication, Defendant's actions, under the direction of newly appointed Town Manager Nathan Johnson, culminated in a

pretextual performance improvement plan ("PIP") and subsequent wrongful termination under the guise of Plaintiff's "resignation."

13.     Plaintiff was subjected to differential treatment, discipline, and ultimately fired in retaliation for her internal complaints of gender discrimination, in violation of Title VII.

14.     As the EEOC determined, Defendant enforced a policy that unlawfully deterred employees from making complaints of discrimination by imposing an unreasonable thirty-day limitation for filing such complaints.

15.     The EEOC, upon investigation, found reasonable cause to believe that Defendant violated Title VII by discharging Plaintiff in retaliation for her complaints, highlighting Defendant's unlawful employment practices.

16.     Despite the EEOC's findings and efforts at conciliation, Defendant has failed to voluntarily remedy the unlawful employment practices through conciliation, leading to further harm and damages to Plaintiff.

17.     Plaintiff was hired on April 21, 2015 as Director of Marketing, Communications & Economic Development, reporting directly to the Town Manager.

18.     Plaintiff excelled in this position and worked closely and well with all Town Managers from April 21, 2015 until March 2020 when Nathan Johnson, as the new Town Manager, began to focus his discriminatory efforts on Plaintiff.  Plaintiff received numerous bonuses and commendations for her performance during this time period from the Town Manager, as well as the interim Town Manager and Town Finance Director ("FD") and Town Council.

19.     During her employment, Plaintiff, along with her staff, were instrumental in the metamorphosis of Dillon − transforming the town into a vibrant thriving community and producing award-winning event programming.

20.     Defendant hired Nathan Johnson as Town Manager (TM) and he began work in March, 2020.

21.     Mr. Johnson did not have regular individual meetings with Plaintiff or her department for the first ten months of his employment.  It was Plaintiff who suggested and scheduled regular meetings with TM to gain visibility into his expectations.  The TM frequently canceled these meetings or was just absent despite having the meetings on his calendar.

22.     Nonetheless, during 2020, Plaintiff focused on guiding the Town, her team, and event programming through the pandemic.  Her annual review was positive and Plaintiff was commended again for her communication and for creative marketing and events concepts.

23.     Over the course of Mr. Johnson's employment, however, Plaintiff and other department heads became concerned with the TM's lack of communication and lack of outlined expectations.

24.      The TM's expectations were so unclear across all departments that he had to outline his expectations for the first time to all department heads in a December of 2021 staff meeting, more than a year and a half after the start of his employment.

25.     Plaintiff found the TM to be less engaged, less involved, less informed, and less accessible than prior town managers.  The TM takes a hands-off approach and provides little to no direction or indication of wanting more information or involvement.

26.     The TM places his own reputation above all else and in Plaintiff's experience, when Mr. Johnson learns of an issue that has political implications for him, without any previous understanding of the situation, he swoops in, takes over management of a project, discussion with third party vendors or business, and changes direction of a project, resulting in a "fire-drill" across departments.

27.     The TM has created an antagonistic environment for all employees and especially women employees at the town hall.  He has made business and third-party vendor interaction with the Town difficult if not impossible.  The TM has returned the Town from vibrancy to blight by overseeing the "torching" of many long-standing local business and third-party vendor relationships with the Town since the start of his employment.

28.     The TM has consistently shown an inability to conduct proactive outreach or lead through relationship-based processes, with examples from the entryway signage to workforce housing, to basic relationship management with the business community and Dillon residents which has led to a communications and reputational crisis.

29.     The Town of Dillon business community, including former Pug Ryan's owners to the owners of Arapahoe Café, found Mr. Johnson to be unresponsive to emails or phone calls, resulting in certain entities no longer conducting business in the Town of Dillon.

30.     Against the backdrop of this management style, the TM targeted women for differential treatment, particularly older women, by blaming and disciplining them for his own failures or misperceptions and/or the failures of colleagues in other departments.

31.     For example, the TM claimed Plaintiff did not follow policies and procedures. The policies and procedures did not exist, however. It is noteworthy that two years later, the TM

and Town Attorney are just now reviewing policies and procedures (as demonstrated in the February 6 and February 20, 2024 Manager Update submitted to the Town Council board meeting packets).

32.     Additionally, the TM has consistently engaged in public comments that disparage female employees and female officials within the community. For example, Mr. Johnson has shown a dismissive attitude towards Council member Renee Imamura's requests for one-on-one meetings, questioning her comprehension in a derogatory manner. This pattern extended to his evaluation of the County Commissioners, where he expressed a biased preference for the sole male Commissioner's competence over that of Commissioners Tamara Pogue and Elizabeth Lawrence, by stating that (male) "Commissioner Blanchard is the only one who knows what he is doing."

33.     In another instance, during a staff meeting attended by Scott O'Brien, Carri McDonnell, Craig Simpson, and Cale Osborne, Mr. Johnson made inappropriate comments about Keara Polich and Adam Newcomer being scheduled together for spring planting tasks, stating "what will people even think comparing them?"  His remarks implied a gender-based assessment of their capabilities.

34.     These incidents collectively indicate a troubling pattern of disparagement based on gender, which is not only inappropriate but against the inclusive workplace principles of equality and respect for all.

35.     As explained below, the TM's actions toward Plaintiff demonstrate a pattern of continuous and punitive gender-based behavior in response to perceived issues that could affect him negatively and politically before the Town Council.  Instead of being actively involved in or

asking specific questions regarding the planning and execution of events and attending meetings regarding the implementation of events held with participation across multiple departments; or engaging with Plaintiff's work and communication with the Town Attorney; or interdepartmentally with various department heads, staff and with the various stakeholders, the TM would take a hands off approach − until he didn't.

36.    Only after event planning and work was significantly underway and/or the project plan was being implemented, would the TM express any interest and only then would he evaluate a project plan and implementation from a political point of view to determine whether anything in the planning or project would affect him politically.  He would then develop some perceived issue with an aspect of the plan, become politically fearful of how Town Council would consider the narrative he imagined, and only then provide last-minute change of direction creating a town-wide fire drill to change some aspect of the planning while always assigning full blame of his political fears to the female Plaintiff for some perceived deficiency in planning and/or execution of the project, regardless of her involvement or her responsibility.

37.    The TM's pattern of retroactive involvement resulted in assigning blame to her for actions within her male counterparts' purview. Mr. Johnson did not do the same with male department heads, instead exonerating them for their failures.

38.    For example, during the tear down of the Ice Castles event, the TM became concerned about the unsightly state of the Ice Castles storage lot and the tear down of the event structures in Town Park.  He was fearful about how these events made him look before Town Council.

39.     TM inappropriately attributed blame to Plaintiff for not policing the Ice Castles storage lot and for allegedly giving the third-party vendor an extension of time for storage and tear down.  Plaintiff, however, *never* approved the alleged extension to Ice Castles and in fact sent at least two emails to Mr. Johnson, asking him to address the issue with the Town Council because it was not something she had the ability to approve and was a matter for Council to consider.

40.     Plaintiff also was not responsible for the storage contract.  The policing activities and the equipment storage agreement with the Town were the responsibility of, administered by, and negotiated by Plaintiff's male counterpart, the Director of Public Works.  Yet, the TM inappropriately shifted blame for the failures of Plaintiff's male counterpart to Plaintiff.

41.     By early 2022, it had become clear that the TM was a politically motivated leader who created a toxic, masculine environment which required his reports to walk in lock-step with his ideas and recommendations, and was overseeing the downfall of the Town of Dillon, its associated businesses, and its business and vendor relationships.

42.     Plaintiff and the other female Director (FD) began to bring their laptops to weekly meetings in order to continue working while the TM socialized with the male Directors about sports and politics for the first half hour of these meetings.  It was at these meetings that the TM openly disparaged female community leaders, female employees and female Town Council members.

43.     Plaintiff did not feel safe or comfortable in this environment making a formal complaint against the TM, as he was a male in a position of power and because of her prior

experience reporting a male Event Manager's behavior towards her and subsequent poor treatment by the  Town of Dillon.

44.     In fact, an exit interview of an intern and a subsequent investigation revealed that this (now former) male Event Manager had been creating a hostile work environment and was making disparaging and sexually harassing comments about Plaintiff, including but not limited to calling Plaintiff the *c-word* to co-workers. At the time of Plaintiff's complaints, Defendant did nothing to support Plaintiff, pursue the matter further or discipline the Event Manager.

45.     Defendant has been unreliable in protecting its female employees and has failed to protect Plaintiff.

46.     Plaintiff nonetheless made numerous statements and requested intervention from the FD and JoAnn Tyson, Human Resources ("HR") Manager for the Town of Dillon.  These communications were sufficient to put these managers on notice that Plaintiff was complaining about unequal treatment. Each of these communications fell on deaf ears and no record of these communications can be found in Plaintiff's personnel file, at least as it was provided to her in or around the time of her termination.

47.     On January 25, 2022, Plaintiff received a call from the TM about the impending Pond Hockey event that left her confused and blind-sided.  Plaintiff had been working on this event per Town Council's direction for over a year with the Town Attorney, the third-party vendor, her staff, and interdepartmentally with other Directors and staff.  Prior to this call, the TM was fully aware, or should have been fully aware, of the event and that the third-party vendor was pursuing a special-use permit for the event and permitting of the event through the

Denver Reservoir Recreation Committee (DRReC).  The TM was part of meetings and the recipient of progress reports where the specifics of the event were detailed.

48.     The TM asserted in the January 25, 2022 call that Plaintiff neglected to include him in an email that further discussed parking for the event.  The TM, however, had failed to take interest in the formal submission presented to DRREC in October which included details of the event and the parking component which had already been reviewed by, worked through with, and approved by the Town Attorney.

49.     Despite knowing, or on constructive notice from the months of prior communications and reports (if he is the involved manager he claims to be), the TM became concerned that event parking could be considered a political issue that could make him look inept before Town Council.  Accordingly, TM decided on his own volition and at the last minute to change direction and handle parking differently.  At that point, similar to his actions with Ice Castles, the TM swooped in and elevated the matter to an interdepartmental crisis.

50.     The TM then berated Plaintiff on January 25th saying:  "You just continue to make mistakes like this – and I cannot continue to have your back." Plaintiff was shocked by the harsh treatment received yet again at the hands of the TM.  Plaintiff understood that in fact she made no mistake; she took proper action which was approved by the Town Attorney, and instead understood that TM was again acting out of his personal concerns about how parking on Town property would affect him politically with the Town Council.

51.     Accordingly, in an effort to assuage her boss' concerns, Plaintiff made an apology to TM and agreed to the TM's plan to have Plaintiff take responsibility for his last-minute change of direction and agreed to present the TM's last-minute change of direction of parking

before Town Council, indicating that this change was her idea/fault and not the result of lack of attention or last-minute political concern and change direction on behalf of the TM. Out of fear for her job, Plaintiff took the blame for the TM, as he approved.

52.    Plaintiff considered the Pond Hockey parking issue to have concluded successfully.  However, the TM again engaged in the same pattern of retroactive hindsight analysis of event preparation and execution, and attributing blame to Plaintiff for failures by other departments.

53.    Prior to the Pond Hockey event, the TM accused Plaintiff of failing to approve a liquor license application for the third-party purveyor and accused Plaintiff of failing to understand and account for the fact that the liquor license application conflicted with a year round liquor license held by Pug Ryan's Tiki Bar at the same location.

54.    Contrary to the TM's allegations of failure, Plaintiff, in her role of Director of Marketing, did not review or approve liquor license applications on behalf of Defendant. Defendant has a separate department (e.g. the Town's Liquor Licensing Authority) to accomplish these tasks.  Although, as part of prudent planning for the Pond Hockey event, Plaintiff and her team reminded the third-party purveyor of the Pond Hockey event of the need to obtain a liquor license from Defendant and to submit their application early to the Town's Liquor Licensing Authority.

55.    The third-party purveyor submitted their liquor license application to the Town's Liquor Licensing Authority on about January 5, 2022.  The Town's Liquor Licensing Authority sat on the application for several week and didn't even know of the issue regarding the existence of an overlapping year-round license held by a seasonal summer operator (Pug Ryan's Tiki  Bar).

56.    The issue of an overlapping license was only brought to Plaintiff's attention in late January 2022.   Plaintiff was not aware, nor should she have been aware, of the Liquor Licensing Authority's delay in handling Pond Hockey's application or any potential overlap in licenses.  But immediately upon learning of the issue, it was Plaintiff who solved the problem and worked interdepartmentally with the Town's Liquor Licensing Authority and with both external partners to obtain consent for a temporary modification of the existing liquor license premise.

57.    Yet, in the TM's sworn declaration to the EEOC, the TM declares it was he alone who worked with Pug Ryan's to achieve resolution of the matter.

58.    During the course of these events, the TM's pattern of shifting blame of perceived failures of others and delays of other departments to Plaintiff remained intact.

59.    On Friday afternoon, February 4, 2022, Plaintiff was shocked to receive a performance improvement plan (PIP) emailed from the TM without any advance notice or direct communication.

60.    The PIP email set a meeting for Tuesday, February 8th at 10am to discuss the PIP with the TM and HR.  Mr. Johnson specifically requested Plaintiff to prepare and provide comments and strategies to resolve the matters because he felt that Plaintiff needed "to make these corrective actions immediately to have a productive and professional relationship."

61.    The PIP, however, was vague and indefinite and did not include any metrics for success and included never-before-communicated allegations of Plaintiff's perceived failures.

62.    The first supposed performance deficiency was noted as "insubordination" to the TM.  TM accused Plaintiff of having a lack of respect towards him, a negative demeanor, and

continual confrontation over policy, process and procedures.  "Insubordination" was apparently how he viewed Plaintiff's decision-making and robust conversation about legitimately different ways to handle new events.

63.     The TM did not accuse male employees of insubordination when they engaged in decision-making and robust conversation about legitimately different ways to handle events.

64.     The TM repeatedly made allegations that Plaintiff  was "being too emotional," something he did not say about male employees.

65.     The allegation of insubordination changed the PIP into a document that impacted the terms and conditions of Plaintiff's employment and made a termination, based upon such subjective criteria, imminent.

66.     Plaintiff was caught between a rock and a hard place.  If she continued to advocate for her ideas and solutions, she would be considered insubordinate.  If she remained quiet and waited for Mr. Johnson's direction, she would be accused of neglecting her duties.  If she pointed out that certain job duties were not within her scope of work, she would be labeled "defensive" if not insubordinate.

67.     The PIP was a trap laid, and purported justification, to enable the TM to pull the termination trigger on Plaintiff at any time and no later than the end of the PIP.  Plaintiff was clearly a woman employee that the TM had no intention of keeping on staff.

68.     Plaintiff was so surprised to receive the PIP email and its contents that she contacted the FD on the same day to enquire as to whether she knew of the PIP, to which the FD responded that "no she did not."

69.     Plaintiff also immediately contacted another Director, to inform him of the PIP and to explain that she was alarmed by the PIP and associated behavior of the TM, and that she was planning on challenging the PIP and filing a complaint with the EEOC.  The Director indicated that he would separately contact the FD about these issues and inform her of Plaintiff's plan to challenge the PIP and to file a complaint with the EEOC against the TM.

70.      The male Director expressed to Plaintiff that the FD had previously told him that "the Town Manager has a problem with women."

71.     Plaintiff requested a copy of her personnel file, which she received on February 7, 2022.  After receiving and reviewing her personnel file, Plaintiff's long suspected beliefs of TM's unequal gender-based treatment of and his bias against her were validated and comported with what she witnessed him hold against women in general.

72.     In the file, TM inserted notes that attributed to her intentions that did not exist on her part and found fault with her over his perception that she did not support him.  The subject matter of these notes were never before discussed with her.  In particular, the TM created notes that called out his perception that Plaintiff "did nothing to deflect the negative comments" about him from a community member.

73.     The TM inserted additional notes into her personnel file indicating that she was "vindictive," had "stoked a fire and was trying to draw attention to" the TM and that she was "very mouthy."

74.     "Very mouthy," "vindictive," and "stoked a fire" are the words the TM used to describe Plaintiff personally and not to describe anything related to her job performance.  These phrases are not stray remarks, but direct gendered assertions about Plaintiff.

75.     These notes reveal the TM's underlying disdain of the Plaintiff as a woman. "Mouthy" and "vindictive" are words used to describe "backtalk" and impudence.  These phrases reveal the TM's subjective and biased impression of Plaintiff, whereas he would have described the same conduct from a man as advocacy. Men don't call other men mouthy.  That is a word typically reserved for women.

76.     In fact, "vindictive," "stoking a fire," and "very mouthy" are barely coded phrases for a description of Plaintiff as "a bitch."  The TM knew he could not say that so he chose proxies to express his bias.

77.     After reviewing and understanding the contents of the personnel file, Plaintiff wrote a thoughtful and detailed response to the PIP as requested by the TM and provided it on February 8th for discussion during the scheduled meeting.  In  response, in addition to refuting the allegations with performance-based details, Plaintiff explained that she was being treated differently than male counterparts, that the TM was targeting her as a woman over 40 and that she was being set up to fail and that the TM had described her in words connoting disdain for women.

78.     Plaintiff engaged in protected conduct and opposition.

79.     Plaintiff explicitly stated that she was not resigning and felt she was being forced into a (future) constructive discharge and that paid leave was probably appropriate until resolution could be reached.

80.     The TM canceled the PIP meeting that morning because he said he had not had sufficient time to review the responses.

81.     Later that day, HR appeared to reschedule the PIP meeting for the morning of February 9, 2022.  When Plaintiff arrived to discuss the PIP with the TM and HR, she was surprisingly met by the Mayor and HR.  Instead of taking her complaints of gender-based treatment seriously, Plaintiff was fired on the spot.

82.     The Town purported to act under the guise and charade of accepting Plaintiff's "resignation."  Plaintiff protested this action.

83.     Stunned, Plaintiff was told to collect herself and instructed to collect her things, turn in her keys and computer, and leave town hall immediately.

84.     Plaintiff again made it clear that she was not resigning, as she had explicitly detailed in writing the day before.  Moreover, Plaintiff worked on both February 8th and 9th and also sent emails after the meeting, reiterating that she did not resign.  Nevertheless, the Town continued its semantic charade, pretending to have somehow accepted a resignation that was never tendered.

85.     Plaintiff never offered her resignation and in no way quit.

86.     Plaintiff was fired the day after she engaged in protected conduct and raised good faith complaints of discrimination and retaliation.

87.     Plaintiff was fired based upon the PIP's discriminatory treatment of her and in retaliation for her protected conduct.

88.     After her wrongful discharge, Plaintiff further reviewed her personnel file, and in particular the metadata associated with those files.

89.     Upon review, it became clear that at least six documents were manufactured and inserted into Plaintiff's personnel file under the cover of the weekend on Sunday, February 6,

2022 after the Defendant was on notice of the Plaintiff's intent to challenge the PIP and to file an EEOC complaint against the Defendant over the TM's behavior and actions.

90.     These manufactured documents contain blatantly false information and statements of issues never before raised with Plaintiff, attempt to retroactively and falsely "paper" Plaintiff's file, and wrongfully purport to provide context to the PIP and retroactively justify its issuance.

91.     Upon information and belief, the TM and the HR manager engaged in this pretextual and harmful behavior of retroactively creating documents to place in Plaintiff's personnel file in order to legitimize the TM's PIP which, in turn, singled out Plaintiff for disparate treatment.

92.     Defendant has a track record of disparate treatment of females versus males in the workplace and in sweeping gender-based issues under the rug.  For example, the TM did not place males on a PIP for comparable conduct.

93.     In another example of the TM's more favorable treatment of similarly situated male Directors, in the summer of 2021, serious allegations of misconduct and illegality, including underage drinking and sexual assault, were alleged and uncovered at the Defendant's marina.  These issues led to threatened legal action against Defendant.

94.     In particular, there was an open cooler of alcohol available to all employees labeled "Brother's Bar" located behind the marina office.  This bar was open to all employees without age restriction and was used by underage drinkers.

95.     Furthermore, employees would take boats out after hours and throw wild parties late at night.  This lead to allegations of sexual assault and further claims of underage drinking.

96.    The Marina Director knew of these events and "Brother's Bar" and the TM knew that the Marina Director knew of the same.

97.    Yet, the male Marina Director was told to claim to "not have known" of any these events.

98.    Instead, the male Marina Director was told by HR to "sit in the corner and shut up" while the Town led an investigation to identify a female Marina Supervisor at fault.

99.    The female Marina Supervisor was fired at the end of the Town's investigation, but the TM did not discipline the male Marina Director, who was the supervisor of the fired female Marina Supervisor.

100.    In accordance with above, Defendant though its TM and HR, led another conspiracy – this time to cover up saving the male Marina Director's job at the expense of his female report's job.  To further the conspiracy, the Town concealed from the State Liquor Board and failed to (i) self report the Defendant's violations of its own liquor license by providing the "Brother's Bar" at the Marina and by providing access thereof to minors; (ii) seek a liquor license application from its own own Liquor License department or the State Liquor license authority for its provision of Brother's Bar; and (iii) failed to self report to appropriate authorities that the footprint of "Brother's Bar" overlapped with the liquor license owned by Pug Ryan's (e.g. the liquor license the TM accuses Plaintiff of not knowing about and potentially jeopardizing during the Pond Hockey Event detailed above). These actions by the Defendant directly jeopardized Pug Ryan's liquor license, the Town's liquor license(s), and put the Town at great liability all in order to save the male Marina Director's job.

101.    Defendant was placed in a position of extreme liability based on these events and established practices. Yet, the TM took no action against the male Marina Director but he placed Plaintiff on a PIP for supposedly engaging in insubordination to him.

102.    Over the course of 18 months, the EEOC diligently investigated the allegations contained in the Plaintiff's Charge of Discrimination and on September 22, 2023, the EEOC issued a letter of determination finding that Plaintiff was unlawfully terminated.

103.    All conditions precedent to the maintenance of this action have been met.

## FIRST CLAIM FOR RELIEF
### (Gender Discrimination in violation of Title VII)

112.    Plaintiff incorporates all allegations above as if stated fully herein.

113.    Plaintiff is a member of protected class (gender) in that she is a female and over the age of 40.

114.    Plaintiff was treated differently than similarly situated male employees working for Defendant, including by placing her on a PIP for false reasons. A reasonable person would find such actions to be materially adverse.

115.    Defendant treated women and men differently based upon their conformance to gender stereotyped norms.

116.    Defendant terminated Plaintiff under circumstances giving rise to an inference that such adverse actions were taken based upon gender.

117.    Plaintiff has been damaged in amounts to be determined at trial.

## SECOND CLAIM FOR RELIEF
### (Retaliation in violation of Title VII)

118.    Plaintiff incorporates all allegations above as if stated fully herein.

119.     Plaintiff engaged in protected activity by making a good faith complaint about her gendered treatment by the TM.

120.     Defendant took adverse actions against Plaintiff by terminating her one day after receipt of her protected opposition by purporting to accept her resignation and by continuing that charade after Defendant could not hold any good faith basis for believing that Plaintiff had resigned.

121.     Defendant failed to reinstate Plaintiff even after it understood she had not resigned.

122.     A causal connection exists between Plaintiff's protected activity and the adverse actions.

123.     As a result of such retaliation, Plaintiff has been damaged in amounts to be determined at trial.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that the Court enter judgment in her favor on all claims and award her the following damages:

1)  Pre- and post-judgment interest, costs and attorney's fees;

2)  Economic and non-economic damages;

3)  Compensatory and punitive damages;

4)  And all other relief and damages as allowed by law.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

DATED: March 18, 2024.

Respectfully submitted,

*/s/ Susan P. Klopman*
Susan P. Klopman
H&K Law, LLC
3900 E. Mexico Ave. Ste. 300
Denver CO 80210
303.749.0659
sklopman@hklawllc.com
*Attorneys for Plaintiff*

Plaintiff's address:
PO Box 5703
Dillon, CO  80435